UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:                                                      CASE NO: **06-11163**

**RHONDA BENOIT LOBELL**                                    CHAPTER 7

DEBTOR


**BROOKE CREDIT CORPORATION**                               ADVERSARY NUMBER

PLAINTIFF                                                   **07-1028**

V.

**RHONDA BENOIT LOBELL**

DEFENDANT

## MEMORANDUM OPINION

Brooke Credit Corporation ("Brooke") sued to prevent the chapter 7 discharge of debtor Rhonda Benoit Lobell ("Lobell"), to except Lobell's debt to it from discharge on several grounds and for injunctive relief. Lobell's obligation to Brooke is excepted from discharge under 11 U.S.C. §523(a)(6). The court also denies Lobell's discharge under 11 U.S.C. §727(a)(2) and (7). Brooke did not establish its entitlement to the other relief it sought.

## FACTS

**A.     Lobell and Brooke Embark in Business**

Rhonda Lobell has spent much of her adult life in the insurance business. She worked for Wright and Percy, a local independent insurance agency, from 1985 until January 2001. She left that firm to start her own independent insurance agency, which she named Lobell-Dixon Insurance Agency, LLC ("L-D").

Lobell set out to expand her business in 2004 by purchasing other area insurance agencies but was unable to locate financing. An acquaintance gave Lobell's name to Brooke Franchise ("Brooke").[1] Brooke's business model involved the purchase of independent insurance agencies which it then sold on credit to third parties who ran the agencies as Brooke franchises.[2] Brooke was interested in acquiring and selling insurance agencies to establish its franchises around Baton Rouge.

On November 15, 2004, Jim Crombie of Brooke electronically mailed Lobell financial information (including cash flows and pro formas) for two independent insurance agencies Brooke had available for sale, one in Baton Rouge and the second in LaPlace. Lobell was interested in buying the two agencies and also making L-D's Gonzales office a Brooke franchise. The November 15, 2004 electronic mail also transmitted credit and franchise applications.[3]

Warren Kuberry of Brooke visited Baton Rouge in November 2004 to accompany Lobell on an inspection of the Baton Rouge and LaPlace agencies. Though Lobell was the intended purchaser and Kuberry accompanied her, she insisted at trial that Kuberry alone performed the only due diligence in connection with the purchases.

---

[1] Plaintiff Brooke Credit is an affiliate of Brooke Franchise (Pretrial Order, Stipulations 1, 2 and 5). Except where the distinction is significant, Brooke Credit and Brooke Franchise both are referred to in this opinion as "Brooke." Brooke Credit and Brooke Franchise are both affiliates of Brooke Corporation, which is a "complex conglomerate" operating many subsidiaries in the business of "franchising, franchise and insurance related lending, insurance brokerage, loan brokerage and providing various services for its Franchisees." See "Report of Examination of the Market Conduct Affairs of Brooke Corporation and Affiliated Entities Overland Park, Kansas as of January 31, 2007" ("Insurance Department Report") conducted by the Louisiana Department of Insurance, Plaintiff's Exhibit 14, pp. 2-3.

[2] Pretrial Order, Stipulation 1.

[3] Plaintiff's Exhibit 15, pp. 7764-88.

### B.     Lobell-Dixon Agency Transactions

L-D, Lobell's independent insurance agency, agreed to buy the Baton Rouge agency on November 29, 2004.[4] L-D entered into a similar agreement to buy the LaPlace agency on November 30, 2004.[5]

The sales closed on November 30, 2004. Brooke financed L-D's purchase of the two franchises and provided working capital. L-D executed a promissory note in Brooke's favor for $1,167,034.[6] The parties also entered into an Agreement for Advancement of Loans ("Loan Agreement") for both the original purchase money loan and subsequent loans.[7] Brooke took as security a lien on all L-D's tangible and intangible personal property, including its books of business, customer accounts, customer lists, customer files, insurance policies, rights to payments or proceeds, contract rights and goodwill.[8] L-D also signed a franchise agreement to operate the Gonzales, Baton Rouge and LaPlace offices as Brooke franchises.[9] Finally, Rhonda Lobell personally guaranteed payment of L-D's obligations to Brooke.[10]

L-D also entered into a Buyer Assistance Plan with The American Heritage, Inc., another Brooke affiliate, for consulting services relating to the agency acquisition.[11] These services included "inspecting the agency, consulting with the buyer, training services, marketing services,

---

[4]  Agreement for Sale of Agency Assets, Plaintiff's Exhibit 2.

[5]  Plaintiff's Exhibit 5.

[6]  Plaintiff's Exhibits 9 and 11. L-D signed a second promissory note in Brooke's favor on September 14, 2005 for $190,550. Plaintiff's Exhibit 10.

[7]  Plaintiff's Exhibit 8 and Pretrial Order, Stipulation 12.

[8]  Plaintiff's Exhibit 12, p. 3 and Exhibit A. Pretrial Order, Stipulation 18.

[9]  Plaintiff's Exhibit 7.

[10]  Plaintiff's Exhibit 13 and Pretrial Order, Stipulation 20.

[11]  Plaintiff's Exhibit 6.

facility services, facility analysis, personnel analysis and operational analysis during the pre- and post-closing periods."[12]

### C. L-D's Failed Transition to the Brooke System

Shortly after the closing, Brooke sent three employees to help Lobell with the transition of the newly franchised agencies to the Brooke "model." Lobell testified that the transition team was ineffective. She also communicated to Kuberry that she did not like Brooke's accounting and marketing systems. Lobell complained too about delays in handling correspondence and Brooke's requirement that L-D deal only with vendors Brooke selected to finance customers' premiums, to buy office supplies and for printing.[13]

Kuberry admitted that the transition did not go well but disagreed with Lobell on the reason. Kuberry testified that Lobell and her employees did not accept the basic procedures Brooke required its franchisees to follow, particularly the procedures associated with receiving and depositing premium payments. He also testified that L-D's offices were overstaffed.

In any case, the evidence supports a finding that Lobell quickly developed buyer's remorse.

### D. Lobell Helps Form Lobell Insurance Services

Lobell attended a training program for new Brooke agents at the Brooke Training Academy in late February 2005. Her dissatisfaction with this class, and with Brooke generally by then, caused her to begin considering a way to end their relationship. By November or December 2005, Lobell decided to look for another agency to which she could transfer L-D's

---

[12] Plaintiff's Exhibit 14, p. 5.

[13] Kuberry explained that Brooke requires its franchisees to use company-selected vendors, specifically premium financing companies, to take advantage of Brooke's bulk buying power. Transcript of November 7, 2007 trial, p. 80, lines 14-25 and p. 81, lines 1-20.

customers. Not coincidentally, the debtor helped form Lobell Insurance Services around the same time.

Gene Eleazar, Lobell's boyfriend, formed Lobell Insurance Services ("LIS") in November 2005. Eleazar did not then, or at the time of trial, hold a Louisiana insurance agent's license. Lobell helped Eleazar prepare documents needed to create the agency but did not disclose to Brooke either that LIS had been formed, or that she had taken part in its formation.[14] LIS's first employee was Charles Dixon, Lobell's former husband, a licensed insurance agent who had worked for L-D. Dixon was in fact LIS's sole employee for nearly six months, until May 2006.

### E.  Lobell and Brooke's Problems Grow

By early 2006, Kuberry noticed that the L-D agencies' revenues were declining. In mid-February 2006, new Brooke area manager Michelle Mulle met with Lobell for the first time. As an area manager, Mulle was to assist Brooke franchisees with their daily operations including cash flow, work flow, marketing plans, budgets and operating expenses. Area managers also reviewed each franchise's monthly statements from which they could measure the franchise's production and growth.

In their first meeting, Mulle and Lobell discussed work, cash flows and developing a budget to pay Lobell's operating expenses. The only complaint Mulle recalled Lobell making at that time related to a BellSouth debt she claimed Brooke had improperly paid for the prior owner of one of the agencies Lobell had bought.[15]

---

[14]  She testified that she believed no disclosure was necessary. Transcript of November 2, 2007 trial, p. 39, lines 3-22.

[15]  Perhaps as a sign of things to come, Lobell never responded to Mulle's requests for documentation concerning this payment or for information on the uncollected accounts payable for the agencies.

According to Mulle, the three L-D agencies still were not doing well financially in March 2006, nearly sixteen months after the closing. However, Lobell never gave Mulle a "clear explanation" why L-D's revenues continued to decrease while its expenses were increasing.[16]

In fact, by March 2006, unknown to Brooke, Lobell already had begun efforts to move customers' business out of the Brooke agencies. For example, she had transferred certain office operations to Eleazar at LIS.[17] Then, in April 2006, Lobell met with Louisiana Department of Insurance representatives regarding her complaints about Brooke. Lobell testified that despite her dissatisfaction with Brooke, the department directed her to ensure that L-D serviced its clients. She testified that she believed servicing the customers meant sending them and their business to other agencies, including LIS.[18] Actually, the process of urging L-D customers to use other insurance agencies had already begun, though Lobell had not informed Brooke about it.[19]

Even though Lobell testified that L-D's alleged problems with the Brooke system led her to complain to the state insurance department, she did not complain to Brooke itself. Specifically, neither Kuberry nor Mulle could recall Lobell's complaining to them in early

---

[16] Transcript of November 2, 2007 trial, p. 181, lines 2-5.

[17] In response to Mulle's electronic mail request concerning payroll, Lobell stated that Eleazar was handling payroll and Mulle was to direct any further questions to him. Transcript of November 2, 2007 trial, p. 178, lines 23-25. Mulle also testified that Lobell told her in their first meeting that Eleazar was "basically in charge of the personnel in her agencies." Transcript of November 2, 2007 trial, p. 179, lines 1-3. Also in March 2006, Kuberry and Lobell exchanged e-mails regarding a contract with an outside insurance carrier signed by Lobell purportedly on behalf of her former husband, Charles Dixon. Lobell's signing the contract raised questions at Brooke that Lobell never answered adequately, according to Kuberry.

[18] Transcript of November 2, 2007 trial, p. 34, line 18 - p. 36, line 16. Lobell did not call the Louisiana Department of Insurance employees as trial witnesses.

[19] Transcript of November 2, 2007 trial, p. 54, line 25, p. 55, lines 1-21, and p. 56, lines 6-15. Lobell believed that it was her right as manager of an independent insurance agency to take these actions without notifying Brooke.

2006—or any other time—about untimely correspondence, cancelled policies, lack of advertising, carrier access or any other matter.[20]

### F.    Lobell's Lawyer Tries to Negotiate an End to the Parties' Relationship

In late February 2006, Lobell hired lawyer Brett Coonrod to help her and L-D either terminate the Brooke franchise agreements or sell the franchises to Brooke.[21]  Coonrod contacted Brooke concerning Lobell and L-D's debt and the possibility of selling the agencies back to Brooke.  Apparently the parties could not reach agreement because Coonrod's April 20, 2006 letter to Jeff Nourse, Brooke's counsel, rejected Brooke's offer and announced that Lobell planned to close both the Baton Rouge and LaPlace agencies that were a significant part of the collateral for L-D's obligations to Brooke.[22]

Then, in an April 26, 2006 letter, Coonrod responded to an earlier letter from Nourse regarding Brooke's continued willingness to buy back the agencies and its demand that Lobell stop diverting business from the Brooke system.[23]  Coonrod suggested that Lobell would turn over the LaPlace and Baton Rouge agencies to Brooke but cautioned that likely no employees would remain at either agency and that, in any case, L-D would stop paying for utility service at the Baton Rouge location.[24]

---

[20]  Transcript of November 7, 2007 trial, p. 85, lines 17-25; p. 86, lines 1- 25 ; p. 87, lines 1-10 (Mulle); transcript of November 7, 2007 trial, p. 79, lines 5-17; p. 80, lines 3-13 (Kuberry).

[21]  Plaintiff's Exhibit 34.  Lobell actually retained Coonrod while she was continuing to work with Brooke.

[22]  Plaintiff's Exhibit 49.  Unfortunately, neither party offered into evidence Nourse's letters to Coonrod.

[23]  Plaintiff's Exhibit 51.

[24]  In the same letter, Coonrod also tried to deflect Brooke's suspicions that Lobell was diverting business.  He explained that the decrease in commissions from the Gonzales location, for example, was a result of the departure of Charles Dixon, the producer on many of the large accounts on that agency's records, for another agency, and the transfer of his accounts to the new agency.  Plaintiff's Exhibit 51, p. 2.

### G.     The L-D Agencies Close

Negotiations between Lobell and Brooke were not successful, so Coonrod informed Nourse in a May 16, 2006 letter that Lobell had decided to close all three agencies as of May 22, 2006 and turn them over to Brooke.[25] On the heels of the closings, former L-D employees whom LIS had hired away began to contact L-D customers "to get them redirected to Lobell Insurance Services"[26] so they could be properly serviced pursuant to the state insurance department's alleged directive to Lobell. The debtor conceded this at trial and admitted that the employees likely started contacting the customers even before L-D closed.[27] Indeed, Eleazar, Lobell's boyfriend, admitted that he *assumed* LIS would be getting some customers from L-D after starting up.[28]

Lobell also confirmed that LIS conducted an organized mail and telephone campaign to solicit L-D customers to move their business to LIS.[29] She herself shared with LIS customer information that L-D had accumulated and that Brooke had taken as collateral for the loan to L-D.[30] As the *coup de grace*, Lobell became LIS's manager after the three L-D offices closed.[31]

On learning that Lobell was abandoning the agencies, Brooke sent area managers to take over the locations and hire new employees to work in the LaPlace and Baton Rouge agencies. Kuberry and Mulle met with Lobell to retrieve the keys and obtain files and other items from the

---

[25] Plaintiff's Exhibit 71.

[26] Transcript of November 2, 2007 trial, p. 49, lines 10-20.

[27] Transcript of November 2, 2007 trial, p. 48, lines 15-25.

[28] Transcript of November 2, 2007 trial, p. 75, lines 2-6.

[29] Transcript of November 2, 2007 trial, p. 50, lines 15-19.

[30] Transcript of November 2, 2007 trial, p. 48, lines 10-14; p. 54, lines 11-20.

[31] Transcript of November 2, 2007 trial, p. 72, lines 15-25; p. 73, lines 1-8.

offices. At their meeting, Lobell told Mulle and Kuberry that she would leave the codes, user names and passwords to access the customer files on the insurance carriers' websites.[32]

When Michelle Mulle, Brooke's area manager, visited the LaPlace agency after Lobell closed it, she discovered that some office equipment had been removed and that L-D's receipt books for customer payments were missing. The missing receipt books hampered Brooke's efforts to reconcile its records of uncollected customer premiums.[33]

Mulle also discovered that all of L-D's employees in LaPlace had quit. Her efforts to help the agency's customers who tried to make premium payments were thwarted because the computer codes Lobell had given her to access customer policy information by computer did not work. Mulle also learned that most of the customers who came to the LaPlace office had cards identifying them as customers of LIS, not L-D or Brooke, even though the customers had bought their policies at the L-D/Brooke agency.[34] In fact, she obtained a facsimile from a person who had been a customer of the LaPlace L-D agency showing that two former L-D employees contacted him with the news that they were now working at LIS and a request that he sign a form making LIS his new agent of record.[35]

Kuberry and another Brooke employee visited the Gonzales L-D location after Lobell closed it. Kuberry stated that they removed boxes of files and computers from the Gonzales office with Lobell's knowledge.[36] Brooke, however, could not take over the Gonzales office

---

[32] Transcript of November 2, 2007 trial, p. 184, lines 10-17.

[33] Additionally, Mulle later contacted customers whose names appeared on the Gonzales office's list of uncollected accounts and learned that the customers had actually paid those premiums. Plaintiff's Exhibit 57; transcript of November 2, 2007 trial, p. 187, lines 1-25 and p. 188, lines 1-10.

[34] Transcript of November 2, 2007 trial, p. 183, lines 1-23; p. 184, lines 17-23.

[35] Plaintiff's Exhibit 63.

[36] Transcript of November 2, 2007 trial, p. 94, lines 17-25; p. 145, lines 20-25.

because it was unable to come to an agreement with Eleazar, the landlord of the building housing the Gonzales agency, to lease that location to Brooke.[37] Thus, Brooke was forced to find other office space, as well as new employees, for the reopening of the Brooke agency in Gonzales. However, at the time of trial, LIS's Gonzales office occupied the same physical location that L-D's Gonzales office previously occupied.

### H. Effects of the Agencies' Closings

Brooke's Kuberry testified that the value of L-D's LaPlace location had decreased $223,953 between the date L-D bought the agency from Brooke and the end of 2006.[38] During the same period, according to Kuberry, the value of the Baton Rouge agency had decreased $105,595 and the value of the Gonzales agency had decreased $113,059. Thus, Brooke contends the three agencies lost total value of $442,607 in Lobell's hands.[39]

Brooke sent L-D and Lobell a formal notice of default on July 14, 2006 and made demand for $1,340,620.67.[40] By certified letter dated August 25, 2006, Brooke informed L-D and Lobell that the amounts due under the loan were being accelerated and made demand for delivery of the collateral securing the loan.[41] L-D filed chapter 7 on December 13, 2006,[42] and the next day, Rhonda Lobell filed her own chapter 7 petition.

---

[37] Transcript of November 2, 2007 trial, p. 94, lines 1-16.

[38] Transcript of November 2, 2007 trial, p. 102, lines 4-7. According to Kuberry, Brooke based the initial sale price in part on each agency's commission statement for the prior 12-month period.

[39] Transcript of November 2, 2007 trial, p. 103, lines 15-19; p. 105, lines 4-12.

[40] Plaintiff's Exhibit 69.

[41] Plaintiff's Exhibit 70.

[42] Case number 06-11156.

- 10 -

### I.     Louisiana Department of Insurance Report

The Louisiana Department of Insurance, on January 31, 2007, issued a report of its study of Brooke Corporation and its affiliates.[43]  The allegations addressed by the study included nearly all of the complaints Lobell had made about Brooke.[44]  The report concluded that, with the exception of violations not relevant here, Brooke Corporation and its affiliates were in compliance with applicable state statutes, rules and regulations.  The department also concluded that Brooke Corporation's franchise structure was "functioning properly with no adverse or improper practices."[45]

### J.     Lobell and L-D's Failure to Seek Other Relief

Despite the multiple deficiencies and alleged breaches of the franchise agreement Lobell and L-D contend Brooke displayed during their relationship, Lobell conceded that L-D never sued Brooke for breach of contract or sought to mediate or arbitrate its disputes with Brooke.[46]

## ANALYSIS

Brooke seeks denial of Lobell's discharge under Bankruptcy Code sections 727(a)(2), (4), (5) and (7), and a declaration that the debtor's debt to Brooke is non-dischargeable under 11 U.S.C. §§523(a)(4) and (a)(6).[47]

---

[43]   *See* footnote 1, *supra*.

[44]   Lobell offered into evidence an undated "synopsis" of complaints about Brooke that she had provided to the state insurance department.  Defendant's Exhibit J.

[45]   Insurance Department Report, Plaintiff's Exhibit 14, p.16.

[46]   Transcript of November 2, 2007 trial, p. 22, lines 7-20.

[47]   Brooke's complaint also seeks an injunction prohibiting the debtor from soliciting customers for insurance business and diverting assets that were collateral for Brooke's loan.  However, Brooke did not brief that claim either before or after trial.  Pursuant to the August 9, 2007 Scheduling Order, which stated that "issues and positions not timely briefed will be deemed abandoned," the court concludes that Brooke abandoned its request for injunctive relief.

### A.    Brooke is Not Entitled to Relief Under 11 U.S.C. §523(a)(4)

A debt is non-dischargeable under 11 U.S.C. §523(a)(4) if the debtor committed fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. Brooke alleges that Lobell was a fiduciary of L-D, a Louisiana limited liability company.[48]

Louisiana law provides that members and manager-members of limited liability companies "stand in a fiduciary relationship to the limited liability company." La. R.S. 12:131(A)(1). However, the Fifth Circuit has not specifically decided whether members of LLCs are fiduciaries for purposes of section 523(a)(4), although at least one Louisiana bankruptcy court held that a member of an LLC has a fiduciary duty to the LLC, though it did not do so in the context of a dischargeability action. *In re Provenza*, 316 B.R. 225 (Bankr. E.D. La. 2003).

Nevertheless, Brooke argues that Lobell had such a duty, and further, that Brooke may sue on behalf of L-D to enforce the debtor's fiduciary duty. Citing *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 534, n. 24 (5th Cir. 2004), Brooke contends that Lobell knew her actions were bringing L-D into a "zone of insolvency" and that as a result, her fiduciary duty to protect L-D from insolvency somehow extended to Brooke. This claims too much.

*Carrieri* and its progeny, including *In re Rajabli*, 365 B.R. 702, 709 (S.D. Tex. 2007), consider the expansion of fiduciary duty to officers and directors of corporations, not limited liability companies. The opinions apply the law of states other than Louisiana. Brooke has not cited any authority from Louisiana or from the Fifth Circuit applying Louisiana law that supports

---

[48] "In determining whether a particular debtor was acting in a fiduciary capacity for purposes of section 523(a)(4), the Court must look to both state and federal law. The scope of the concept of fiduciary under 11 U.S.C. §523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *Matter of Bennett*, 989 F.2d 779, 784 (5th Cir. 1993), citing *Matter of Angelle*, 610 F.2d 1335, 1339 (5th Cir. 1980).

- 12 -

its argument.[49]  Moreover, it offered no evidence that Lobell knew L-D was insolvent when she diverted assets from L-D.  That evidence is crucial to an expansion of the fiduciary duty on the theory on which Brooke relies.

No controlling authority supports the conclusion that, even if Lobell owed a fiduciary duty to L-D, Brooke had the right to enforce that duty.  On this record, the court will not do so and so will dismiss Brooke's claim under 11 U.S.C. §523(a)(4).

### B. Brooke Proved Its Claim for Relief Under 11 U.S.C. §523(a)(6)

Bankruptcy Code section 523(a)(6) provides that a discharge under section 727 does not discharge a debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  An injury is willful or malicious within the meaning of section 523(a)(6) where there is either an objective certainty of harm or a subjective motive to cause harm.  *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998).  The statute encompasses a debtor's wrongful sale or conversion of encumbered property.  *In re Modicue*, 926 F.2d 452, 453 (5th Cir. 1991).  A court may infer that a debtor acted with malice, for purposes of §523(a)(6), if the debtor acts "in a manner which one knows will place the lender at risk, such as converting property in which the lender holds a security interest." *In re Theroux*, 49 F.3d 728, 1995 WL 103342 at *3 (5th Cir. 1995).

To prevail under §523(a)(6), Brooke must prove not only that Lobell knew of its security interest in the collateral Lobell converted, but also that she either intended to cause Brooke

---

[49] *But see*, *3-Point Holdings, LLC v. Gulf South Solutions, LLC et al.*, 2008 WL 695379 (E.D.La. 2008).  The right of a creditor of an LLC to sue the members of the LLC for breach of fiduciary duty came before the court on an unopposed motion for summary judgment.  The court cited *Carrieri* but did not discuss it, and held that the members of the defendant LLC were liable to the plaintiff, a creditor, for breach of fiduciary duty by making transactions that put the LLC in the "zone of insolvency."  The *3-Point* case was not a bankruptcy case and the reasoning of the court in applying the "zone of insolvency" theory of *Carrieri* was not extensive.  Accordingly, the court respectfully declines to follow *3-Point* on this record.

financial harm in converting the collateral or that the conversion was substantially certain to result in financial harm to Brooke.

The collateral for Brooke's loans to L-D, and the debtor's guaranties, included L-D's book of business, customer accounts, customer lists, customer files, insurance policies, rights to payments or proceeds, contract rights and goodwill—essentially everything L-D owned.

Lobell admitted knowing that Brooke held the customer information of the three agencies as collateral for the loan. She signed all sale and financing documents on L-D's behalf. Lobell is an experienced insurance agent and businesswoman and it is reasonable to infer that she, as an experienced business person, knew that disposing of or converting this type of collateral would jeopardize the lender's security interest by impairing the value of the collateral. *See Theroux*, 1995 WL 103342 at *3 (concluding debt non-dischargeable on ground that it was reasonable to infer that experienced seller of mobile homes knew selling homes "out of trust" would put the creditor's security interest at risk).

The evidence supports a finding that Lobell's acts were objectively and substantially certain to harm Brooke. Although Rhonda Lobell knew that virtually all of L-D's assets were security for the Brooke debt, she directly or indirectly, through her cooperation with LIS, diverted the staff and customers of the three agencies from L-D to LIS.

Lobell's trial testimony also supports a finding that she intended to harm Brooke. Specifically, the debtor admitted that as early as December 2004, when the Brooke transition team arrived, she was dissatisfied with the Brooke "model" for operating its franchises. Lobell also admitted that after attending the Brooke Training Academy in February 2005, she began thinking of an "exit strategy."[50]

---

[50]   Transcript of November 7, 2007 trial, p. 19, lines 3-9.

By November or December 2005, Lobell had decided to identify another agency which could allegedly better serve L-D's customers. Instead, she helped her boyfriend, Gene Eleazar, to create a new agency, LIS, and concealed that from Brooke. The new agency's name included Lobell's surname and undoubtedly would compete with L-D for business in the same geographical areas. Also, despite Lobell's claim that she was trying to work with Brooke to resolve operational and accounting problems, according to the testimony of Kuberry and Mulle, Lobell did not communicate her complaints to either of them. Both Mulle and Kuberry stated that they had difficulty getting cooperation from Lobell regarding various requests and inquiries as late as the beginning of 2006. Lobell's testimony on this point was not credible.

Lobell's scheme extended to the use of L-D personnel to divert customers from L-D and reduce its value. Thus, even before the businesses closed on May 22, 2006, L-D's employees began to contact L-D customers to persuade them to move their business to LIS. Lobell herself shared L-D customer information with Eleazar. Finally, before turning the offices over to Brooke, Lobell (or someone acting at her direction or with her permission) removed equipment and receipt books. This impaired Brooke's ability to serve the remaining customers and the evidence supports an inference that it was a ploy to drive them away from L-D and to LIS.

Lobell admitted her decision to divert L-D clients to her boyfriend's agency and did not disavow her actions to persuade them to move to LIS. She attempted to justify her actions on the ground that Brooke was not satisfactorily serving the customers and that she was merely following the directions of the Louisiana insurance regulators to service L-D's clients. However, the evidence, including the implausibility of her testimony (which is utterly without credibility) betrays her intent to divert L-D's customers to LIS and thereby harm Brooke. Her actions were objectively certain to cause harm to Brooke and its collateral. Lobell willfully and maliciously

caused injury to Brooke's property and as a result, her debt to Brooke is not dischargeable under §523(a)(6).

  **C. The Debtor Should Forfeit Her Discharge Under 11 U.S.C. §727(a)(2)(A) and §727(a)(7)**

Section 727(a)(7) of the Bankruptcy Code bars the discharge of a debtor who commits any act specified in section 727(a)(2), (3), (4), (5) or (6) within one year of the date of the debtor's filing of a petition, if the act is done in connection with an insider's bankruptcy case. Lobell and L-D are insiders of each other. 11 U.S.C. §101(31)(A)(iv) and (B)(iii).[51] Therefore, any act Lobell committed under 727(a)(2)-(6) in connection with L-D's bankruptcy within the year before Lobell filed her own petition is sufficient to bar her own discharge.

Denial of a debtor's discharge under section 727(a)(2)(A) requires proof of:

  (1) a transfer [or concealment] of property;

  (2) belonging to the debtor;

  (3) within one year of the filing of the petition; [and]

  (4) with intent to hinder, delay, or defraud a creditor or officer of the estate.

*In re Pratt*, 411 F.3d 561, 565 (5th Cir. 2005). Because loss of the discharge is such a severe penalty, evidence of a debtor's actual intent to defraud creditors is essential. *In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983). Courts recognize that actual intent is difficult to prove and so rely on evidence of "badges of fraud" that evidence an actual intent to defraud. Badges of fraud include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of

---

[51] *See also*, Stipulation 30 of the Pretrial Order.

> debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Chastant*, 873 F.2d 89, 91 (5th Cir. 1989) (citation omitted).

Moreover, evidence of a debtor's intent to hinder or delay creditors, even if not fraudulent, will trigger loss of a debtor's discharge under section 727(a)(2). *In re Bowyer*, 916 F.2d 1056, 1059 (5th Cir. 1990) (*defraud* does not subsume *hinder* or *delay*); *In re Morris*, 51 B.R. 462, 464 (Bankr. E.D. Tenn. 1985) (language of section 727(a)(2) is disjunctive). "Debtors can be said to act with an intent to hinder their creditors if they intend to impede or obstruct them. They can be said to act with intent to delay if they intend to slow or postpone their creditors." *In re Boudrot*, 287 B.R. 582, 586 (Bankr. W.D. Okla. 2003). *See also In re Womble*, 289 B.R. 836, 854 (Bankr. N.D. Tex. 2003) ("intent to hinder or delay" is intent to act improperly to make it difficult for a creditor to collect a debt).

Brooke contends that Lobell transferred, or caused to be transferred, property of L-D to LIS within the year before L-D filed its petition on December 13, 2006, with the intent to defraud or hinder Brooke. The evidence showed that between November 2005 and May 2006, and definitely in early 2006, within the year before both Lobell and L-D filed bankruptcy, the debtor transferred customer information and caused the transfer of the customer base and the book of business of L-D to LIS.[52] The remaining issue is whether Lobell transferred L-D's property with intent to defraud or with intent to hinder Brooke in any way. The evidence of several badges of fraud supports a finding and conclusion that she did.

First, L-D received nothing from LIS for the transfer of the customer base. Second, as a result of Lobell's relationship with Eleazar, her boyfriend, Lobell was still able to benefit from

---

[52] *See*, FACTS, *supra*, Section E, pp. 5-6 and Section F, p. 7.

the customers who left L-D for LIS. Indeed, she worked for LIS after the L-D agencies closed. Also, the timing of the movement of former L-D customers to LIS coincides with the period in early 2006 when L-D's business declined.

Lobell's own actions also demonstrate her intent to hinder Brooke. The transfer of virtually all of L-D's customer-related assets to LIS impeded Brooke's ability to resume operation of those agencies once Lobell abandoned them and thereby hindered Brooke's ability to protect its collateral. Lobell's role in orchestrating the movement of customers from L-D to LIS effectively kept Brooke from realizing the value of the collateral for its loan to L-D.

Lobell justified her actions by arguing that Brooke's breach of the franchise agreement compelled her and L-D to develop an "exit strategy": helping her boyfriend establish a competing business (LIS) and participating in transferring L-D's customers to that business. However, Lobell's attempts to resolve her disagreements with Brooke were only perfunctory; she did not make any reasonable effort to resolve the alleged disputes. Her only formal effort was a complaint to the Louisiana Department of Insurance regarding Brooke's alleged failings, which did not result in significant corrective action or penalties against Brooke.

Because Lobell transferred L-D's property with the intent to defraud and hinder Brooke within one year of the filing of her bankruptcy case, she is not entitled to a discharge. 11 U.S.C. §727(a)(2) and (7).

**D.     Brooke Did Not Prove Its Entitlement to Relief Under 11 U.S.C. §§727(a)(4) and (5)**

Brooke's complaint also sought denial of the debtor's discharge under sections 727(a)(4) and (5).[53]

---

[53] Although Brooke omitted any discussion of these theories from its post-trial brief, its trial brief (P-85) included a discussion of the claims, and at trial, Brooke offered evidence relating to them.

- 18 -

Denial of discharge under §727(a)(4) requires proof that the debtor made a false statement under oath, the debtor knew the statement was false, the statement was made with fraudulent intent, and the statement was material to the case. *In re Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001). Brooke alleges that Lobell falsely stated at her §341 meeting of creditors that (1) she signed the Brooke loan documents under duress and (2) she had no L-D business records because Brooke had taken them all without her consent after she abandoned the agencies.

Lobell testified that she *felt* she was under duress due to the accelerated pace of the transaction with Brooke. Therefore, her statement was not literally false and will not support denial of her discharge under section 727(a)(4).

Lobell's second statement—that she had no records because Brooke had taken them without her consent —was knowingly false, because the debtor did know that Brooke representatives took L-D's records after she closed the agencies. However, although the records undoubtedly were material to the debtor's business dealings and assets, Brooke offered no evidence that Lobell made the statement with fraudulent intent. Moreover, she did ultimately produce the business records of L-D.[54] Accordingly, Brooke has not sustained its burden of proof with respect to the L-D records and the court will dismiss its section 727(a)(4) claim.

Bankruptcy Code section 727(a)(5) requires the court to deny a debtor's discharge if the debtor failed to explain a loss of assets or a deficiency of assets to meet their liabilities. Under §727(a)(5), a satisfactory explanation requires more than the debtor's vague and indefinite assertions about the missing assets. *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (citations omitted).

---

[54] Lobell eventually did produce L-D's business records at a Rule 2004 examination on March 2, 2007.

Brooke alleges that Lobell did not satisfactorily explain L-D's sudden loss of assets in the year before it filed bankruptcy. Brooke itself contends that L-D's most valuable assets were its customer lists and accounts. The debtor unabashedly admitted that she advised L-D's clients to find other insurance agents because she believed that Brooke, through L-D, would not adequately serve them. Although Brooke may dispute Lobell's explanation for the decrease in L-D's assets, the explanation is neither vague nor indefinite. Accordingly, Brooke's claim under §727(a)(5) will be dismissed.

## CONCLUSION

Debtor Rhonda Lobell's debt to Brooke Credit is declared non-dischargeable pursuant to 11 U.S.C. §523(a)(6). Additionally, Rhonda Lobell is not entitled to a discharge under 11 U.S.C. §§727(a)(2) and (7). The court will dismiss all other claims in Brooke's complaint.

Baton Rouge, Louisiana, June 19, 2008.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE